Penal actions and proceeding are strictly local.

Can it be presumed, that the Legislature intended, for the purposes of the civil remedy, to include act or acts, neglects or defaults, not intended to be the subjects of the criminal proceeding.

Upon the whole it is quite clear to me, that it was not intended by these statutes to make the act or acts, neglect or default, complained of in this case, which it must be assumed occurred out of this State and within the jurisdiction of another State, the subject of the civil remedy given by the statutes ; and that therefore the complaint in this case does not show any cause of action under these statutes; and that the judgment at special term should be reversed ; and that the defendant should have judgment on the demurrer.

## PATTERSON a. PERRY.

*New York Superior Court, General Term, December,* 1859.

ATTACHMENTS.—LEVIABLE PROPERTY.—CONSIGNOR AND CONSIGNEE.

A non-resident debtor having shipped goods to his factor within this State, a creditor issued an attachment, under the Code of Procedure, against the property of the debtor, and served the same on the factor after the bills of lading were received, but before the goods had come within the county. The factor at the time was largely in advance to the consignor, but he had in hands goods, and notes received for goods sold, to an amount exceeding the attachment, the proceeds of which, together with the proceeds of goods represented by the bills of lading, which latter subsequently arrived, were more than enough to pay his balance. After the latter goods had arrived and the balance of account turned in favor of the debtor, another creditor issued a similar attachment, and served it upon the same factor.

   *Held,* that as between these creditors the first attachment was entitled to priority of payment. There was property of the defendant in goods and notes, in the hands of the factor at the time of the attachment, and the factor alone could assert his lien to the defeat of the attachment; and the amount of his

lien having been subsequently paid, the surplus was left bound by the attachment.

*It seems*, that whatever may be taken on execution, may be taken on an attachment issued under the Code of Procedure.

*It seems*, that a bill of lading in the hands of the consignee is not property of the consignor within the meaning of section 464 of the Code.

The right of a consignee in advance to his consignor, to property on hand, or to a bill of lading made in his name, is a qualified property commensurate with, and to support his lien, and no more.

Appeal by several defendants from a judgment awarding a fund to the other defendants.

This action was brought by the plaintiff as administrator of Albert Lewis, deceased, who had consigned goods to the defendant Perry for sale, and it sought an accounting and payment of the balance due. Other parties were made defendants on allegations that they claimed liens on the balance by virtue of attachments, the validity of which the plaintiff contested. The defendant Perry paid into court the balance due from him, and was discharged from the action, and the other defendants who claimed the fund under their respective attachments against the property of the deceased, were required to interplead.

The facts on which the questions arose were substantially as follows :

Prior to April 1, 1854, Albert Lewis of Cincinnati, having advanced largely to his brother on provisions, and having the possession and right of sale in consequence, was in the habit of shipping them from time to time, and forwarding bills of lading to Samuel Perry of New York, for sale on commission, who made advances from time to time, keeping a general account with Lewis. On April 1, 1854, the balance of account was against Lewis, part only of the goods previously shipped having arrived in New York, though all the bills of lading had come to hand. On or about April 1st, Lewis shipped another lot of provisions at Cincinnati, and the bills of lading of this lot were received by Perry, April 5, 1854.

The same day (April 5th), after the bills of lading of this last lot had thus been received, a copy of attachment and notice was served on Perry on behalf of White, Warner & White, credi-

tors of Lewis. Perry paid freight, &c., on this last lot of goods, but becoming alarmed in consequence of the attachment, refused thenceforward to accept Lewis's drafts, or to make further advances. The remainder of the goods shipped before April 1st, as well as those comprised in this last lot shipped on the first, continued to arrive from time to time, during the latter part of April, May, and the first part of June, and had all, or nearly all, arrived in New York by June 15th, 1854, on which day a copy attachment and notice was served on Perry on behalf of Milne & Reid, also creditors of Lewis. No attempt was made by the sheriff to take possession of the goods under either attachment, no inventory was made and no certificate was obtained. Perry continued selling the goods and repaying himself his advances, commissions, freight, and charges, the sales extending into September, 1854. No separation or discrimination was made between the parcels as sold from time to time, and no separate account of sales was kept, but the proceeds went into a general account between Perry and Lewis, resulting in a balance in favor of Lewis.

The court at special term held that the plaintiff's claim was not sustained, and awarded the fund to the creditors whose attachment was last issued. The other creditors appealed.

*S. W. Roosevelt*, for the appellant.—I. It is the opinion of the court below, that the fund in dispute was chiefly produced by the sale of the last lot of goods, and that Perry had paid charges, but had not made advances on this last lot specifically. It appears, however, from Perry's accounts, which are in evidence, to have been the course of dealing between Lewis and Perry, not to discriminate among the various lots, but to sell a portion of one with another as suited the market, not keeping separate accounts with each lot, and if one lot did not fully repay advances, the next lot was sold to meet the deficiency, and such indeed is of necessity the general custom among commission merchants. It is therefore difficult to ascertain as a matter of fact, which of the lots *per se* may fairly be said to have produced the fund in dispute. It appears to be conceded by all parties, however, that Perry was consignee of all the goods, and in possession of the bills of lading, with the right to sell the whole in order to pay himself advances, commissions, and expenses, and he did sell

the whole accordingly. No attempt was made under either of the rival attachments, to take possession of the goods or interfere with Perry's sales, and nothing was done by the sheriff beyond the service of copy and notice, and the court finds that the last lot was subject to Perry's advances, which were a balance of advances not repaid by the proceeds of the previous lots.

II. Under these circumstances, the presence of the goods in the county cannot affect the priority of the attachments, as between these defendants. The sheriff cannot take possession of goods so consigned (Brownell *a.* Carnley, 3 *Duer*, 9), and, in fact, he did not take possession. When no levy can be made on goods under an attachment, their precise location, at a given moment, is both theoretically and practically of little ·importance, and can certainly not settle priorities.

III. Neither of the attachments, therefore, could in law, or did in fact, reach the goods, nor can either be said to have reached the interest of the consignor in the goods. The interest of a party in goods, as such, cannot be considered as attached, when the creditor is not enabled, by force of the writ, directly or indirectly, to take possession of or control the property. Perry, the consignee, might rightfully have sold all the goods before they came into the county, and had, in all respects, complete control. The attachment of White, Warner & Co., has priority, because—1. Under neither attachment was any levy or inventory made, or possession taken of the goods. 2. Under both the inchoate indebtedness of Perry to Lewis was attached in the order of service.

IV. A levy under any attachment should inure to the benefit of a former attachment by statute, by analogy with executions at common law, and as a matter of sound policy. (Leak *a.* Tiffany, 2 *Comst.*, 450, 457; Ray *a.* Birdseye, 5 *Den.*, 624, 625; Solomon *a.* Freeman, 4 *Sandf. Ch.*, 515; 3 *Rev. Stats.*, 5th ed., 645, § 15, 336; *Code*, § 232; 12 *Johns.*, 403.)

V. Lewis was not himself owner, but was consignee or pledgee, having made advances, and, therefore, possessing a lien which he transferred to Perry by the bills of lading: and this fact removes the goods, as goods, still further out of the scope of the attachment, and renders the interest of Lewis more plainly such a claim, as when assigned to Perry, was subject forthwith to attachment without reference to the location of the goods.

*G. C. Goddard*, for the respondents.—I. The attachment of White had no *prospective* operation, so as to reach property coming into the county, and into Perry's hands, *after the service of it.* It was served on the 6th of April, and at no subsequent time. By the terms of the Code, and by the nature of the writ of attachment, no property is reached by it, except that in the county and on hand when it is served. (*Code*, §§ 231, 232, 235, 236, 240, 241 ; *Rev. Stat.*, vol. 2, 2d ed., 4, §§ 7, 8, 28–34 ; Learned *a.* Vandenburgh, 7 *How. Pr. R.*, 379 ; S. C., 8 *Ib.*, 77.) Attachments in other States are analogous. (Fitch *a.* Waite, 5 *Conn. R.*, 122 ; Lane *a.* Jackson, 5 *Mass.*, 162.) In this respect, attachments are unlike executions, which take effect by delivery to the sheriff, except against *bona-fide* purchasers for value.

II. The bills of lading being in Perry's hands, did not subject to the attachment property on the Ohio River, or elsewhere, on its way to New York. They are merely evidence of *Perry's* having some interest in the property, but have no effect to bring the property within the reach of the sheriff. As to that shipped on the 1st of April, Perry had then no interest in it, not having advanced or paid any thing on it. (Grant *a.* Shaw, 16 *Mass.*, 341.)

III. Perry had a *specific* lien for his advances and charges on all the property, except that shipped on the 1st of April ; on which last he refused to advance. As against Milne & Co., had the question arisen, Perry would have been bound to look first to the property on which he had such *specific* lien. But the funds in court, are found, in fact, to arise from the property received after April 6, and chiefly from that shipped on the 1st of April.

By the Court.*—Hoffman, J.—The counsel for the appellants insist that an addition should be made to the finding of facts, which is warranted by the evidence, and will modify one conclusion of fact actually found, and affect the conclusion of law arrived at by the judge below. It relates to the state of the accounts between Perry and Albert Lewis generally, and particularly at the time of the reception of the bills of lading of the last parcels of the goods consigned.

---

\* Present, Hoffman, Pierrepont, and Monorief, JJ.

An analysis of the accounts of Perry contained in the case, presents these results: On the 6th day of April, 1854, Perry was a creditor of A. Lewis in the sum of about $38,000. This balance was due for acceptances outstanding, maturing in May, June, and July, none before the 28th day of May, 1854. The sales which had then been made, were credited when made, although the time of credit given on such sales was not yet expired, or the notes taken not yet matured.

On the said 6th day of April there were some goods in Perry's hands unsold, of a value greatly less than the balance due him. There were also unpaid and immature notes in his hands exceeding $8000, given upon purchases of the produce.

On the said 6th day of April, bills of lading were in the hands of Perry, with letters of consignment, for goods to the amount of over $47,000.

Between the 6th day of April and the 15th day of June, the goods thus consigned arrived and came to Perry's hands. These consisted of two classes of produce: *first,* those received from April the 8th to June the 11th, which were received (except an inconsiderable portion) by the 5th day of May; and, *second,* the parcels which arrived from the 16th day of April to the 9th day of May, and the invoice price of which was $8548.98. On the 15th day of June, the account stood with a credit-balance in Perry's favor of $5416.67, which was overpaid by the 17th day of June, and Perry became a debtor in $1350.83.

The subsequent receipts from sales, that is, after the 17th day of June, amounted to $8143.13, and the subsequent charges to $2666.86, leaving a balance of $5476.27 on this account, and a total balance against Perry as of September the 1st, 1854, of $6827.10. By the account-current it is $6896.62.

The consignment, with the bills of lading of the particular produce shipped on the 1st day of April, and mentioned in the letter of that date, and the amount of which was $8548.98, was sold indiscriminately with other parcels of produce of the same kind. No separation was made of the parcels. The judge has found that the fund in dispute was principally produced by the sale of these specific parcels of produce. With the exception of 139 barrels of rump-pork, we do not think his conclusion supported by the evidence.

Another fact is deducible from the evidence, viz., that of Per-

ry's acceptances, over $10,000 fell due after the 30th day of June, 1854. On that day there was in his hands, in cash, from sales, over $6000, and for unsold goods and unpaid notes, over $10,000 more.

The first important question is, whether an attachment will bind goods received by a consignee subsequent to its service, when the consignee had at the time of notice the bill of lading in his hands, with advice of the consignments, the goods being out of the county, but on their passage from a foreign place. And this question arises as between such attaching creditor and a subsequent one attaching after the goods had arrived within the county, and when they or their avails were in the consignee's hands.

The answer to this question in the affirmative would dispense with the necessity of examining any other point, and decide the case in favor of the appellant. I think, however, that this simple and unmixed question cannot be so answered.

Section 227 of the Code provides, that a plaintiff may have the *property* of the defendant attached in the manner prescribed, as a security for the satisfaction of such judgment as may be recovered by the plaintiff. By section 231, the warrant is to be directed to the sheriff of any county in which property of such defendant may be, and shall require him to attach and safely keep all the property of such defendant within his county, or so much thereof as may be sufficient to satisfy the plaintiff's demand. Several warrants may be issued at the same time to the sheriffs of different counties. So by section 234, all property in this State, of a defendant, is liable to be attached and levied upon, and sold to satisfy the judgment.

Thus, under the Code, the property which may be attached is, first, property as defined therein; and, next, that property when found in the State. If in the State, then the warrant must go to the sheriff of the county in which it is found.

Thus the question is reduced to this: was the bill of lading in Perry's hands *property*, within the meaning of the Code? If it was, then it was within the county of the sheriff of New York.

The definition of property in section 464 of the Code is, that it includes property, real and personal; and the definition of personal property is, "money, goods, chattels, things in action, and evidences of debt."

It seems impossible to understand how a bill of lading, after it is in the hands of the consignee, is a thing in action belonging to the consignor named in it, or an evidence of a debt owing to him. It is a symbolical transfer to the consignee of the property, and of a right of action against the carrier. It contains no evidence that the consignee is indebted to the consignor.

The two cases in Massachusetts, of Grant *a.* Shaw (16 *Mass.* 341), and Andrews *a.* Ludlow (5 *Pick.*, 28), are exactly in point, unless there exists a distinction upon any peculiar different provisions in the statutes of that State. Section 24 of the revised act of 1836 (*Laws of Mass.*, ch. 90, 549) provides, that all goods and chattels that are liable to be taken in execution may be attached and held as security, except such as, from their nature or situation, have been considered as exempt from attachment, according to the principles of the common law, as adopted and practised in this State.

By section 19 of chapter 97, title 3, part 3, p. 589, " all chattels, real or personal, and all other goods that are by the common law liable to be taken in execution, may be taken and sold thereon," with certain exceptions.

It appears to me that there is nothing in the statutes of Massachusetts differing from our own definition of property, which may give rise to any doubt of the pertinency of the cases referred to, unless it be that a bill of lading is a *chose in action*, or *evidence of a debt*, belonging to the consignor. This, I have before stated, does not seem to be a tenable proposition.

The case of Grant *a.* Shaw decides expressly that one who has received a bill of lading and invoice of goods consigned to him, cannot be charged, as trustee of the consignor, until the goods have arrived, and the consignment has been accepted. An attachment laid when the bill of lading only was on hand, was superseded by a subsequent attachment laid after the goods had arrived. I notice that in the forms in evidence, the sheriff is directed to attach all property within, or which may thereafter come within, his county. I do not think this practice can vary the view now presented, if it is at all warranted.

2. But the question as presented upon the peculiar facts of this case is different, and of no little interest and concern in this mercantile community. When the attachment of the appellants was served on the 6th day of April, Perry had on hand an ag-

gregate of goods, notes given for goods, and bills of lading representing goods on the way to him and subsequently received, more than enough to discharge all his demands, including immature acceptances, and to leave a balance equal to the amount claimed by these attaching creditors. Again, the remaining goods, and the unpaid notes then in hand, exceeded the amount of the demand of the appellants.

It is stated as a rule of law, that the attachment may be defeated by the lien of the garnishee upon the goods of the defendant, provided it be to the full amount of the value of the goods attached. If it be not to the full extent of the value, then the judgment is taken for the goods subject to the garnishee's lien, which must be ascertained from the garnishee, or at the trial. (*Locke on Attachments*, 57. He cites Giles *a.* Northam, *infra;* and *Bohun's Privileges of London*, 270.)

In Giles *a.* Northam (5 *Taunton R.*, 558), cited by Mr. Locke, it was held, that the property in a cargo for which the master had signed bills of lading, might be transferred by delivery, without the indorsement of the bills of lading. The title would be subject to the claim of a *bona-fide* indorsee of the bill of lading. But whether such property passed or not, Northam, the consignee, had a lien upon the cargo for advances, and no creditor of the owner could attach it, or the produce of it, without discharging such lien. " Without doing this, Levin himself (the owner) could not have recovered it; and they who attached property as belonging to Levin, could not have a larger right than he possessed before the attachment. Supposing, therefore, that in the interval between the delivery of the cargo and the indorsement of the bill of lading, Northam had a mere lien upon it, still it could not be attached as the property of Levin, without discharging it from the lien."

In Curtis *a.* Norris (8 *Pick.*, 280), an engagement to pay was held enough to prevent the attachment from affecting more than the surplus of goods in the garnishee's hands.

In The Bank of South Carolina *a.* Levy (*McMullen's R.*, 430), it was decided that a garnishee, to warrant the retention of goods on hand, need not prove that he was entitled to bring an action. It would be sufficient if his outstanding liabilities exceeded the amount of funds. This gave him a special property, superior in its nature.

In Nolan *a.* Crock (5 *Humph. R.*, 312), an attachment was served when the garnishee was in advance for an actual cash balance, and was then under liabilities which he paid before the hearing of the cause. He was allowed for both, before the attaching creditor could come in.

I apprehend that the law is, that a factor or consignee, such as Perry was in this case, could sustain his lien for his own unpaid acceptances against an attaching creditor. (Black *a.* Lachani *et al.*, 3 *How. U. S. R.*, 483.) Yet there is some authority to the contrary. (See Nelson *a.* Martin, cited in *Locke on Attachment*, 57 *note ;* Taylor *a.* Gardner, cited by Mr. Sergeant (*On Attachments*, 103), as decided by Judge Washington, C. C. U. S., January, 1811 ; S. C., 2 *Wash., C. C. R.*, 686.)

But the lien in this point of view may be regarded as eventual and conditional; leaving the consignee a right to hold and resort to then existing funds for reimbursement, when he pays his own liabilities. The argument that the actual property in the notes was in *Lewis*, thus receives some confirmation.

The property to all the goods comprised in the bills of lading passed for many purposes to Perry; by his possession of such bills, coupled with his being in advance, and passed to him, before the goods themselves had arrived. (See further Anderson *a.* Clark, 2 *Bing. R.*, 20 ; Haillie *a.* Smith, 1 *Bos. & Pul. R.*, 513 ; Bryan *a.* Mix., 4 *Mason & W. R.*, 792 ; Brownell *a.* Carnley, 3 *Duer R.*, 9.)

This property or right in property extended to all the goods indiscriminately. Although in point of effect, there was a property in more goods represented by the bills of lading than the amount of his demand, yet neither Lewis nor any one under him, could claim a right to separate any particular parcel, and withdraw it from Perry's hands, without payment of the balance due him.

The correlative right and interest seems necessarily to have existed in Lewis. His remaining interest extended on the 6th day of April as much to the goods unsold, and to the notes unpaid for goods sold, as to the goods represented by the bills of lading, and in the course of transportation. If so, there was actual property in New York, in Perry's hands, which the attachment could fasten upon.

To repeat—Perry had on the 6th day of April a heavy debt

owing him; he had some goods on hand, and notes taken on previous sales to an amount exceeding eight thousand dollars; he had bills of lading made in his name by the owner, comprising property which, with the goods and notes above-mentioned, exceeded in value his demand by over six thousand dollars.

Why was not Lewis's interest in the excess of this property applicable to the aggregate property? why not as much applicable to the unpaid notes then on hand, as to the goods in transition, and subsequently received?

In considering the cases above cited, and the principles they appear to involve, it seems to me more accurate to say, that the right of a consignee in advance for his consignor to property on hand, or to a bill of lading made in his name, is a qualified property, commensurate with and to support his lien, and no more; that strictly, and in legal precision of language the consignor is the owner. The qualified property enables the consignee to sue others for interfering with the goods; enables him to compel a delivery, or to support a claim for damages; and to defeat a claim of the shipper to stop *in transitu*. Still it is a special property—an ownership as lien holder, and nothing more. It is not absolute. It leaves the direct title, and something of interest in the consignor. A lien in its general sense, is the right to retain the property of another to answer a demand. (*Bouv. Law Dict.*, tit. *Lien;* Rock *a.* Jenness, 7 *How. U. S. R.*, 612.) The reasoning of the court in Brownell *a.* Carnley (3 *Duer*, 9), appears to me to sustain this view.

Section 32 of the statute of Massachusetts (ch. 90, part iii., 550, ed. of 1836) provides, that if the estate that is attached (real property) is subject to a mortgage or other incumbrance, and the mortgage is redeemed, or the incumbrance removed before the levy of the execution, the attachment shall hold the premises discharged of the mortgage or incumbrance, and the execution may be levied with the same effect, as if the mortgage or other incumbrance had never existed.

I may also advert to the cases of Scott *a.* Whittemore (7 *Foster's R.*, 309), and Hill *a.* Wiggin (11 *Ib.*, 300). In these it has been held that where property in the hands of a mortgagee was attached, no one but the mortgagee himself could make an objection as to the right of property being in the mortgagor. The

former case was a mortgage of personal property. "The mortgagee may or may not insist on his rights as mortgagee, and thus avoid the attachment. Until he does so elect, the attachment remains valid, though defeasible."

*Again*, it appears to be a well-settled, general rule, that property which is subject to execution, is liable to attachment. (Handy *a.* Dobbin, 12 *Johns.*, 220.)

"Property" may be taken under the attachment. Its definition by the Code has been before stated. An execution may be against the *property* of the judgment-debtor (§ 286), and the *fi. fa.* is to direct satisfaction *first*, out of his personal property; and if enough cannot be found, *then* out of the real property. It seems a very just inference that, by the Code, what may be seized upon execution, may be attached.

Now by section 20 of the act "of executions against property" (2 *Rev. Stat.*, 366), when goods or chattels shall be pledged for the payment of money, or for the performance of any contract or agreement, the right and interest in such goods of the person making such pledge, may be sold on execution against him; and the purchaser shall acquire all the right and interest of the defendant, and shall be entitled to the possession of such goods and chattels, on complying with the terms and conditions of the pledge.

It is insisted on behalf of the defendants, White, Warner & White, that the provisions of the statute respecting executions (2 *Rev. Stat.*, 305, §§ 13, 14, 15), apply to the present case.

By these enactments, executions bind from the time of the delivery. "If there are several executions issued out of a court of record against the same defendant, that which shall have been first delivered to an officer to be executed shall have preference, notwithstanding a levy first made under another execution; but if a levy and sale has been made under the subsequent execution before an actual levy under the execution first delivered, the goods shall not be levied upon or sold under such first execution." Then section 15 provides, "that if there be one or more executions, and one or more attachments against the property of the same defendant, or if *there be several attachments*, the same rule prescribed in the last section shall prevail, in determining the preference of such execution or attachment."

By section 16, "an execution or attachment issued out of a

court not of record, if actually levied, shall have preference over any other execution issued out of any court, whether of record or not, which shall not have been previously levied."

The sale under the subsequent execution is rendered valid; the purchaser's title shall not be defeated by·a future levy and sale under the senior execution. But it is said, that in making a disposition of the proceeds, on such sale, the sheriff must be governed by the priority in the delivery of the executions to him, unless such prior executions have for some reason become dormant as to the subsequent ones. (Peck *a*. Tiffany, 2 *Comst.*, 45.)

The Revisers in their note to these provisions (vol. iii., 727) state, that they.are conformable to 4 *Cow.*, 411. There a *fi. fa.* first delivered to the sheriff, took preference of an attachment levied before the *fi. fa.* was levied ; Lambert *a.* Spaulding (18 *Johns.*, 311) was relied upon as decisive. The attachment was from a justice.

Roy *a*. Hauount (19 *Wend.*, 495) was decided under section 16 of the act. A levy was made by the plaintiff, a constable, on the 5th day of August, 1834, by virtue of three attachments issued by a justice of the peace against the property of *Clow.* The sheriff of the county of Ulster had received an execution, and had taken some steps towards a levy on the 4th day of August, which was held insufficient as to the property in question. The attachments prevailed.

The provisions referred to can scarcely apply to attachments under the absent and absconding debtors act, found in the Revised Statutes of 1830. Those proceedings inured to the equal benefit of all the creditors who might come in. Attachments issued under that act could not be discontinued, without time being given to other creditors to appear. (In the matter of Bunch, 9 *Wend.*, 424.)

But there was a series of statutes, under which attachments similar to those of the Code issued, particularly on proceedings in justices' courts. (See 1 *Rev. Laws*, 1813, 393; *Laws of* 1824, ch. 238, §§ 23, 24.) Under these provisions it has been held, that the constable under an attachment, could take any goods and chattels which could be levied upon by execution. (Handy *a.* Dobbin, 12 *Johns.*, 220.) That the lien created by an attachment under the act (*Sess. Laws*, 204, § 21 ; 1 *Rev. Laws*, 1813,

398, § 23), when duly served was paramount to a subsequent execution or attachment. The lien would expire if the creditor did not prosecute his suit to judgment and execution with due diligence. (Van Lorn a. Kline, 10 *Johns.*, 135; Sterling a. Welcome, 20 *Wend.*, 238.)

To attachments of this character, the provisions in the enactment as to executions, may well apply.

But a difficulty exists in understanding how these enactments of 1830 can apply to the attachments under the Code of 1848, without a special provision, making them applicable.

Section 232 referred to does not meet the case. The sheriff is to proceed in the manner required by law in cases of attachments against absent debtors. It prescribes his course of action merely.

Section 471 of the Code provides, that the second part of that act shall not affect " any existing statutory provisions relating to actions, not inconsistent with this act, and in substance applicable to the actions hereby provided."

The enactment then of the Revised Statutes before mentioned remains in force, but the question still is, has that enactment been applicable to attachments under the Code?

But if these provisions can in any way be treated as prevailing under the Code, yet it seems to me that if there is no property in the hands of the party which is the subject of an attachment at the time of notice served, property so subject coming afterwards to hand, is not affected. If another attachment is then levied, it must prevail. An attachment takes its effect, not from delivery to the sheriff, but from its service. Supposing then that where there is property subjected to an attachment when it is placed in the sheriff's hands, but not served, a service of a subsequent attachment inures to the benefit of the first, and gives it priority. I do not see how that rule can prevail, when there was no such property on hand, at the delivery of the first.

These are my difficulties on this point, and the ground therefore upon which I place my judgment in the case is that before stated, of an actual sufficient attachment of leviable property subject to the lien of Perry, which he alone had a right to say displaced the effect of the attachment; and as he has been paid the amount of his lien, has left that property substantially bound.

MONCRIEF, J.—The material question arising upon the evidence in the court below was, whether "the attachment of Milne & Reed, though subsequent in time, took priority in effect?" and it was held it did, and judgment was ordered for the payment of the funds to them. This, in my opinion, was erroneous.

The court below found that the debtor, Albert Lewis, had such an interest or property as was the subject of attachment. This view cannot be questioned; it is expressly so decided in 3 *Duer*, 9.

The property was in Samuel Perry by virtue of his previous advances, and the possession of the bills of lading gave to him, as against the world, the right to receive the goods and to dispose of them. (3 *Duer*, 12; 5 *Seld.*, 559.)

A notice of the issuing of the attachment was served upon Mr. Perry in each action. The same deputy-sheriff had possession of both writs.

In the case of White and others, the notice and copy attachment were received by Mr. Perry on the 6th day of April, 1854, and while the goods were on their way to New York. In the matter of Milne & Reed, the notice was served on the 15th day of June, 1854, and after the arrival of the goods at New York. Strictly speaking, neither attachment was levied upon the property in the hands of Mr. Perry, nor was there on behalf of either party such a service of the attachment as the law requires to create a lien. No inventory was made, and no notice given specifying the particular property or interest seized. (5 *Duer*, 250; 9 *Conn. R.*, 530; 7 *Ib.*, 271; 4 *E. D. Smith's R.*, 443.) In neither instance did the deputy-sheriff receive a certificate from Mr. Perry.

The attachment of White and others was a valid and continuing process in the hands of the sheriff, at the time of the receipt of and service of notice under the attachment of Milne & Reed.

An attachment is "an anticipated execution," to take and hold the property subject to a judgment in the action. (Thayer a. Willett, 16 *Johns.*, 107.) Execution in the hands of the sheriff binds the goods, and any levy made by him inures to the benefit of the executions in the order in which they were received. (1 *Cow.*, 592; 7 *Taunt. R.*, 57; 1 *Arch. Pr.*, 259; 2 *Comst.*, 451.)

The statute makes it the duty of the sheriff, upon the receipt

of any execution, to indorse thereon the year, month, day, and hour of the day, he received the same. (3 *Rev. Stat.*, 5th ed., 643, § 10.) Section 14 provides that, " if there be several executions issued out of a court of record against the same defendant, that which shall have been delivered first to an officer to be executed shall have preference, notwithstanding a levy may be first made under another execution ;" and by section 15 it is further provided that, " if there be one or more executions, and one or *more attachments* against the property of the same defendant, or if there be *several attachments*, the same rule prescribed in the last section shall prevail in determining the preference of such executions or attachments. (See also 2 *Cow.*, 451.)

Previous to the Code there were, as now, the attachment for the benefit of creditors generally (under the absent, concealed, and non-resident debtor act), and for the specific benefit of the pursuing creditor, by virtue of the non-imprisonment act, &c.

The case of Grant *a.* Shaw (16 *Mass. R.*, 341), cited in the court below, was a case in which the defendant, at the time he was first summoned as trustee, had no property or interest in any property belonging to the debtor. He had expressly declined to accept the shipment, although the bills of lading had been sent to him, having refused acceptance and payment of the draft drawn thereon, the bills had been returned to the debtor. The plaintiff, after the return of the bills of lading, and the receipt of the goods by the defendant, again summoned him, but not until other creditors had served him with their processes.

It is quite evident, from the statement of the case, that the facts are dissimilar to the case under consideration.

The court, PARKER, J., said : " The defendant was not trustee until he had accepted the consignment and received the goods; until then it rested in contingency, whether he would be a debtor of the consignor or not. Had the defendant accepted the bill when presented, there could have been no question."

The statutes of Massachusetts provide that the garnishee cannot be attached, *inter alia*, 4th, by reason of any money or other thing due from him to the defendant, unless at the time of the service of the writ on him due absolutely, and without depending on any contingency. (*Rev. Stat. Mass.*, 1836, 643, 651.)

An examination of the statutes did not enable me to find a

provision similar to that in our State, relative to the priority of executions and attachments, and I believe none exists.

I am clearly of opinion that as between the two attaching creditors—and the contest is confined to them—the attachment first delivered to the sheriff had priority, and that the court below erred in giving preference and awarding judgment in favor of the latter.

A new trial should be ordered, costs to abide the event.

PIERREPONT, J., concurred.